IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SWISS REINSURANCE AMERICA COMPANY, ) <br> for itself and as Reinsurer of AMWEST SURETY ) <br> INSURANCE COMPANY in Liquidation, ) <br> Plaintiff, ) <br> v. ) <br> ) <br> AIRPORT INDUSTRIAL PARK, INC. ) <br> doing business as P.E.C. CONTRACTING ) <br> ENGINEERS, PESH, INC., PAUL EDWARD ) <br> CHAMBERS and NANCY DEFAZIO, also ) <br> known as NANCY D. CHAMBERS, ) <br> Defendants. ) | 2:05-cv-01127 |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are cross-motions for summary judgment: Defendants' MOTION FOR SUMMARY JUDGMENT (Document No. 26) and Plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT (Document No. 30). The motions have been thoroughly briefed, responses have been filed (Documents Nos. 27, 31, 33, 35, 36, 39) and the motions are ripe for resolution.

Factual and Procedural History

This case arises in a rather complicated factual setting. The genesis of the dispute occurred when a surety company, Amwest Surety Insurance Company ("Amwest") became insolvent. Plaintiff Swiss Reinsurance America Company ("Swiss Re"), a "reinsurer," seeks to enforce an indemnity agreement entered into between Amwest and Defendant P.E.C. Contracting Engineers ("PEC").[1]

---

[1] For simplicity and clarity, the Court will refer to all Defendants collectively.

On September 28, 1995, Amwest and PEC entered into a General Indemnity Agreement ("GIA"). The GIA states that it **"is executed by the Undersigned for the purpose of indemnifying [Amwest], herein referred to as "Surety," in connection with any Bonds written on behalf of [PEC]."** The GIA defines the term "Surety" to include Amwest "**its affiliates, subsidiaries or reinsurers, and any other person(s) or entity(ies) which the Surety may procure to act as a Surety or as a Co-Surety on any Bond, or any other person or entity who executes a Bond at the request of Surety**." PEC's agreement to indemnify and hold Amwest harmless is "**[i]n consideration of the execution and delivery by the Surety of a Bond or any Bonds on behalf of the Principal**."

In December 1998 or March 1999, the Army Corps of Engineers ("Corps") awarded PEC a contract to construct a new dock front on Neville Island, near Pittsburgh, Pennsylvania. Surety bonds were required by the Miller Act, 40 U.S.C. § 3131. On March 25, 1999 Amwest issued to the United States as obligee, with PEC as principal, a Payment Bond in the amount of $1,858,772.40 and a Performance Bond in the amount of $4,646,931.00.[2]

Also on March 25, 1999, Swiss Re entered into a reinsurance agreement with Amwest. In consideration for a "sum mutually agreed upon" from Amwest, Swiss Re provided reinsurance on the Performance Bond in the amount of $2,646,931.00. The "purpose and intent" of the reinsurance agreement was to indemnify the United States (up to the amount of reinsurance) against loss as to any sum that was owing and unpaid by Amwest under the Performance Bond.

---

[2]The Performance Bond and Payment Bond both bore the number 1382830. The Court of Claims, with compelling reasoning, rejected PEC's argument that Amwest had provided a single "payment and performance bond." This Court also concludes that the payment and performance bonds represented distinct undertakings.

PEC was identified as the "principal" but was not a party to the reinsurance agreement. Swiss Re did not provide reinsurance on the Payment Bond, because it did not exceed Amwest's underwriting limit. The construction project proceeded, although several delays were encountered.

On June 7, 2001, a court in Nebraska declared Amwest to be insolvent and entered an order of liquidation. Amwest's liquidator then notified PEC that the payment and performance bonds on the Neville Island project would not be honored. On July 6, 2001, the Corps notified PEC that its performance and payment bonds were "no longer valid" because Amwest was no longer in business and ordered PEC to secure replacement bonds within ten days.

PEC was unable to obtain substitute bonding. On July 31, 2001, the Corps issued a "cure notice" letter, which noted several deficiencies in PEC's performance: (1) lack of progress at the site; (2) failure to provide an acceptable Payment bond; and (3) a reported failure to pay subcontractors. PEC did not respond to the cure notice. On August 17, 2001, the Corps terminated PEC's construction contract. The Corps required Swiss Re to complete the work. In doing so, Swiss Re incurred a net loss of $1,451, 023.57, exclusive of legal fees.

PEC filed suit against the Corps in the Court of Federal Claims, alleging that it had been wrongfully terminated. In a written opinion dated January 16, 2004, the Court granted summary judgment to the Corps. The parties vigorously dispute the preclusive effect of this opinion. On August 12, 2005, Swiss Re filed the instant case.

Standard of Review

Summary judgment should be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).  The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion.  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249).  Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  *Id*. (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

Discussion

Given the unique fact situation, the parties have not cited any cases that are directly on-point and the Court has not located any such cases in its independent research.  Swiss Re argues as follows:  Pennsylvania law controls;  Surety relationships are matters of contract;  Where an express agreement exists, the specific indemnity rights provided by that agreement trump the common law and define the rights and obligations of the parties;  Swiss Re is a third-party beneficiary of the GIA, as reinsurers are specifically included in the definition of "Surety" in that agreement, and accordingly, Swiss Re is entitled to enforce the terms of the GIA;  Interpretation of contractual language is generally a legal issue, appropriate for summary judgment; and,

4

finally, the GIA "unambiguously obligates the Defendants to indemnify Swiss Re, as a reinsurer, for its losses."

The Court generally agrees with the logical progression of Swiss Re's argument. It will decide this case based on Pennsylvania contract law principles and the language of the relevant agreements. The case is appropriate for summary judgment. There is some question as to whether or not Swiss Re is a third-party beneficiary.[3] Nevertheless, the Court will assume, arguendo, that Swiss Re may seek to enforce the GIA as a third-party beneficiary. However, the Court does not agree with the conclusion that the GIA requires PEC to indemnify Swiss Re under the facts of this case.

PEC argues, persuasively, that the GIA is unenforceable due to a failure of consideration and/or Amwest's prior material breach of the agreement. PEC asserts that because Swiss Re has no privity of contract with PEC and may only step into Amwest's shoes under the GIA, it has no valid cause of action and PEC is entitled to summary judgment.[4] The Court agrees. *See Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line, Inc.,* 85 F.3d 1098 (3d Cir. 1996) (third party beneficiaries to a contract are generally subject to the same defenses the

---

[3] The GIA was executed in 1995 and Swiss Re became a reinsurer some 3 ½ years later. As PEC points out, the reinsurance agreement was issued at Amwest's request, solely for Amwest's benefit. Moreover, at the time the GIA was executed, the parties arguably did not reasonably contemplate that PEC might be responsible to a reinsurer in the event of Amwest's default.

[4] PEC further reasons that Swiss Re should be required to bear the consequences of its own informed (albeit in retrospect, costly) business decision. Swiss Re accepted a "sum mutually agreed upon" to undertake the very risk that transpired – i.e., that Amwest would be unable to perform its obligations under the Performance Bond. PEC argues that an insurer cannot enjoy the reward while forcing someone else to take the risk. The Court appreciates the practicality and intuitiveness of this reasoning. However, its decision is based on the relevant contractual language and general contract law principles.

finally, the GIA "unambiguously obligates the Defendants to indemnify Swiss Re, as a reinsurer, for its losses."

The Court generally agrees with the logical progression of Swiss Re's argument. It will decide this case based on Pennsylvania contract law principles and the language of the relevant agreements. The case is appropriate for summary judgment. There is some question as to whether or not Swiss Re is a third-party beneficiary.[3] Nevertheless, the Court will assume, arguendo, that Swiss Re may seek to enforce the GIA as a third-party beneficiary. However, the Court does not agree with the conclusion that the GIA requires PEC to indemnify Swiss Re under the facts of this case.

PEC argues, persuasively, that the GIA is unenforceable due to a failure of consideration and/or Amwest's prior material breach of the agreement. PEC asserts that because Swiss Re has no privity of contract with PEC and may only step into Amwest's shoes under the GIA, it has no valid cause of action and PEC is entitled to summary judgment.[4] The Court agrees. *See Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line, Inc.,* 85 F.3d 1098 (3d Cir. 1996) (third party beneficiaries to a contract are generally subject to the same defenses the

---

[3] The GIA was executed in 1995 and Swiss Re became a reinsurer some 3 ½ years later. As PEC points out, the reinsurance agreement was issued at Amwest's request, solely for Amwest's benefit. Moreover, at the time the GIA was executed, the parties arguably did not reasonably contemplate that PEC might be responsible to a reinsurer in the event of Amwest's default.

[4] PEC further reasons that Swiss Re should be required to bear the consequences of its own informed (albeit in retrospect, costly) business decision. Swiss Re accepted a "sum mutually agreed upon" to undertake the very risk that transpired – i.e., that Amwest would be unable to perform its obligations under the Performance Bond. PEC argues that an insurer cannot enjoy the reward while forcing someone else to take the risk. The Court appreciates the practicality and intuitiveness of this reasoning. However, its decision is based on the relevant contractual language and general contract law principles.

promisor could raise in a suit by the promisee).  Swiss Re relies heavily upon the definition of "Surety" in the GIA, which indisputably includes "reinsurers."  However, the GIA itself (including its definitions) is unenforceable, for several reasons.

First, Amwest's insolvency constituted a failure of consideration.  As consideration for the obligations undertaken by PEC in the GIA, Amwest was required to provide payment and performance bonds for the Neville Island project.  Upon Amwest's insolvency and liquidation, the bonds became nugatory.  The liquidator disclaimed coverage and the Corps considered the bonds to be "no longer valid" and demanded that PEC secure replacement bonds.  Accordingly, Amwest did not provide valid consideration and the GIA is unenforceable.

Alternatively, PEC's duty to perform under the GIA is excused by Amwest's prior, material breach.  The parties vigorously dispute whether the failure to obtain a replacement bond was the sole reason, or one of several reasons, for the termination by the Corps.  The Court concludes that this dispute is ultimately irrelevant because Swiss Re is attempting to assert rights under the GIA, rather than the underlying construction contract, and there is no evidence that PEC breached the GIA.  Moreover, Amwest's breach of the GIA occurred *prior to* any notice by the Corps that PEC was in default.  The Court notes that Swiss Re was not compelled to complete the project based on the GIA, but rather, on the performance bond it issued to the Corps pursuant to its independent reinsurance agreement with Amwest.  In sum, Swiss Re's argument that PEC might have been terminated from the project on other grounds is purely speculative and is not a valid basis for exercising rights under the GIA.  On this record, it is clear that Amwest's material breach of the GIA, due to its insolvency, excused any further performance by PEC under that agreement.

The GIA is also unenforceable under the doctrine of "frustration of purpose." In *Ragnar Benson, Inc. v. Hempfield Twp. Municipal Auth.*, 916 A.2d 1183, 1190 (Pa. Super. 2007), the Pennsylvania Superior Court recently explained:

> Under the doctrine of frustration of purpose, "[w]hen people enter into a contract which is dependent for the possibility of its performance on the continual availability of a specific thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is prima facie regarded as dissolved." *Hart v. Arnold*, 884 A.2d 316, 335 (Pa.Super.2005) (citation omitted). The Restatement (Second) of Contracts section 261 provides:
>
> Discharge By Supervening Impracticability
>
> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.
>
> *Restatement (Second) of Contracts* § 261 (1981).

In this case, the GIA was clearly and explicitly entered into for the purpose of providing surety bonding. The availability of Amwest to provide such bonds came to an end due to circumstances that were beyond PEC's control. The availability of a solvent surety was a basic assumption by PEC. Upon Amwest's insolvency, the entire purpose of the GIA became impossible. Nothing in the language or circumstances indicates a contrary result. Therefore, the GIA is regarded as dissolved and PEC's duties under the GIA are discharged.

In summary, Swiss Re cannot assert rights under the GIA against PEC. Accordingly, Defendants' MOTION FOR SUMMARY JUDGMENT (Document No. 26) is **GRANTED** and Plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT (Document No. 30) is **DENIED.**

**SO ORDERED** this _____ day of August, 2007. The clerk shall docket this case closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:    Theodore M. Baum, Esquire
       Email: tmb@ernstromdreste.com
       Michael J. Cremonese, Esquire
       Email: mjcremonese@bwhllc.com

       Samuel F. Reynolds, Jr., Esquire
       Email: sreynolds@wgbglaw.com